AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Northern District of California

FILED

SEP 03 2019

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

JCS

| | |
|---|---|
| United States of America<br>v.<br><br>Glennda Santos,<br><br><br><br>_Defendant(s)_ | )<br>)<br>)   Case No.<br>)<br>)      **3   19   71433**<br>)<br>)<br>) |

## CRIMINAL COMPLAINT ~~UNDER SEAL~~

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____July 13, 2017_____ in the county of _____San Francisco_____ in the

____Northern____ District of _____California_____ , the defendant(s) violated:

| _Code Section_ | _Offense Description_ |
|---|---|
| 42 U.S.C. § 1320a-7b(b) | Criminal penalties for acts involving Federal health care "Anti-Kickback Statute." |

This criminal complaint is based on these facts:

Please see attached affidavit.

☑ Continued on the attached sheet.

Approved as to form:

_____

WILLIAM FRENTZEN
Assistant United States Attorney

Sworn to before me and signed in my presence.

Date: ____9/3/2019____

City and state: _____San Francisco, California_____

_____
_Complainant's signature_

Janette Spring, Special Agent - FBI
_Printed name and title_

_____
_Judge's signature_

Hon. Joseph C. Spero, U.S. Chief Magistrate Judge
_Printed name and title_

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Janette Spring, Special Agent with the Federal Bureau of Investigation ("FBI") being first duly sworn, hereby depose and state as follows:

## I. INTRODUCTION

### A. SYNOPSIS

1. I submit this affidavit in support of a criminal Complaint for Glennda SANTOS ("SANTOS").

2. There is probable cause to believe SANTOS engaged in a scheme to commit Medicare fraud by introducing home health care marketers to physicians willing to accept kickbacks in exchange for home health and/or hospice patient referrals, in violation of 42 U.S.C. § 1320a-7b(b), the anti-kickback statute.

3. As part of this investigation, the Agents have obtained information from the cooperation of an FBI confidential witness ("CW-1")[1] and evidence obtained by an FBI undercover employee ("UCE").

4. CW-1 provided information that SANTOS, a prominent home health marketer employed by Amity Home Health Service, Inc. ("AMITY"), among other companies, was paying kickbacks to physicians and hospital case managers in exchange for home health and/or hospice patient referrals.

---

[1] CW-1 has provided information and services to the FBI over approximately two years and has received no monetary compensation or other consideration from the FBI in exchange for the information and services. However, CW-1 was employed by a home health care agency ("HHA Alpha"), which served as a cooperating entity supporting the FBI's undercover operation. As a result of the undercover operation, patient numbers and/or revenue to CW-1 and CW-1's HHA may have increased. These potential increases to CW-1's HHA may have provided benefit to CW-1 by improving his/her standing with the employing HHA. A criminal background check of CW-1 revealed convictions for embezzlement, grand theft, and an arrest for false claim to citizenship. CW-1 is an undocumented immigrant who entered the United States illegally and by presenting false identifying documents to a CBP officer. The CW-1 later falsely denied having possessed false identifying documents when interviewed by immigration officers. Although CW-1 is a removable alien, removal has been deferred under the Convention Against Torture. The CW-1 may have an incentive to curry favor with federal law enforcement because of his immigration status. After the conclusion of this undercover operation, FBI Agents became aware that during the undercover operation but after HHA Alpha was no longer accepting patient referrals from targets of the investigation, CW-1 was believed to have tried to use his/her role as a source to threaten an individual – with whom he/she had a personal dispute – with a law enforcement investigation into the practices of this individual. To my knowledge, those threats were never carried out. CW-1 is not currently the subject of any pending criminal charges.

1

5.      SANTOS later facilitated meetings between CW-1, UCE, and two physicians, who during their meetings, accepted cash in exchange for patient referrals sent to HHA Alpha.

## B.  BACKGROUND OF LEGAL FRAMEWORK AND INVESTIGATION

6.      Starting in the 1970s, Congress created, amended, and strengthened the "Anti-Kickback Act", currently United State Code, Title 42, Section 1320a-7b(b). The relevant language of the statute is listed below. In essence, the law criminalizes influencing referrals for federally funded health care through payments. The legislative history revealed Congress was deeply concerned the normalization of kickbacks in federally funded health care programs would lead to fraud and an undermining of the quality of patient services since "operators become more concerned with rebates than with care.[2]" FBI Agents began looking into kickbacks in the San Francisco Bay Area, specifically in the fields of home health and hospice. Their investigation arose from concerns of false billing, referrals without patient care in mind, that health care providers would have a willingness to expose their patients to unnecessary treatments and that certain home health agencies ("HHAs") would have a willingness to bill for, but not provide, necessary services.  The preliminary investigation into kickbacks occurring in the Bay Area in the fields of home health and hospice revealed that the above concerns were indeed occurring. Some of the most egregious examples uncovered by the investigation included doctors who referred patients to hospice care in exchange for kickbacks while demanding a "longevity" bonus – meaning the doctor would financially benefit the longer a patient remained on hospice. Since hospice is generally meant for palliative care without curative intent, this system could encourage doctors to abandon curative options earlier with potentially life threatening outcomes.[3]

7.      An undercover operation was selected as the means of investigating kickbacks. From training and experience, the investigators understood that health care providers and HHAs shrouded their activities in secrecy. Typically, health care providers were given kickbacks in the form of cash

---

[2] "Kickbacks Among Medicaid Providers", Senate Report 95-320, 1977.

[3] In fact, throughout the course of the investigation, four of the targets, while negotiating kickback payment amounts, discussed similar "longevity" bonuses. UCE agreed to these bonuses or entertained further discussion to potentially identify any such referrals by proactively identifying at-risk patients. During the course of the investigation, no such longevity bonus referrals were made to the UCO.

payments made in closed door meetings between themselves and HHA representatives. Some used bogus medical directorship/consultant contracts to disguise kickbacks as payments for seemingly legitimate, but actually non-existent, services. Given the expected closed nature of the transactions and the relatively traceless nature of cash payments, traditional documentary and other overt investigative techniques were deemed to be ineffective. An undercover operation ("UCO") was considered as the most efficient and most successful means to gather direct evidence of the payments and the corrupt intent of the kickback payments

8.      Around July 2016, two employees of a known Bay Area home health agency ("HHA Alpha") made a complaint to Health and Human Services Office of Inspector General ("HHS-OIG") regarding payments of kickbacks to doctors by other HHAs in the Bay Area. One of the two agreed to serve as a cooperating witness ("CW-1"). CW-1 was paired with an undercover FBI agent ("UCE"), based in San Francisco, who would portray himself/herself as someone representing investors, intent on acquiring HHA Alpha and seeking to expand HHA Alpha's patient population through illegal kickbacks. UCE often communicated with targets in furtherance of the UCO while in San Francisco. The UCO sought to investigate predicated targets and to use predicated targets to refer UCE to other violators who the targets believed to be engaged in similar conduct.

9.      In designing the UCO, investigators learned health care providers were weary of potential legal risks that caused them to be unwilling to accept kickbacks from an unknown undercover agent without an introduction from a known member of the industry. Further, the nature and size of the kickbacks were dependent on the types of HHA services required. For example, certain types of insurance and services were reimbursed at a higher rate, which in turn would lead to higher kickbacks. Many health care providers were also quite concerned with patient satisfaction, partially to avoid a disgruntled patient from questioning the corrupt HHA referral. Therefore, the ability to provide specific details about services, accepted insurance plans, and patient satisfaction was critical to both gaining the initial introductions and to allowing the UCO to expand. The involvement of a vetted HHA would facilitate entry of the UCO and allow kickback referrals to be diverted away from predicated HHA companies. Further, the care provided by the vetted HHA could be monitored and reviewed.

10.     In keeping with those goals, HHA Alpha effectively served as a cooperating entity through its management and its participation in the UCO.  The FBI investigation was partly based upon analysis of so-called outlier data – data showing abnormal and potentially illegal conduct – among HHAs and doctors as well as through interviews. Based on examination of the data and interviews, HHA Alpha did not fall into the profile of a likely kickback offender.  Checks of FBI databases did not reveal HHA Alpha as a prior or current subject of any investigations.  Additionally, the FBI consulted with HHS-OIG and determined HHA Alpha was not a prior or current subject of any investigations. From the founding of HHA Alpha in 2009 until the initiation of the UCO, Medicare received two complaints[4], which were later deemed to be unsubstantiated.  Additionally, HHA Alpha's owner was aware that CW-1 would be cooperating with an investigation and the patient paperwork and referrals to HHA Alpha during the UCO were required to be brought to the attention of the investigating agency.  Patients referred to HHA Alpha by physicians and others receiving payment from FBI through the UCO, (1) were contacted by an employee of HHA Alpha to obtain their consent for treatment by HHA Alpha, (2) as a result of this consent and intake process, some patients ultimately did not receive treatment from HHA Alpha because they declined treatment, preferred an HHA of their own choosing, or medical evaluation determined treatment was inappropriate, (3) HHA Alpha was made aware of patients that were referred through the course of the UCO, and (4) FBI conducted interviews of all available patients referred to HHA Alpha and there were no serious allegations of failure in patient care.[5]  During the course of the UCO, there was one complaint regarding patient care provided by HHA Alpha made by a recently hired, and then fired employee, but an investigation by the California Department of Public Health did not result in any negative finding against HHA Alpha. No other complaints about HHA Alpha were reported to Medicare

---

[4] An anonymous complaint filed in 2016 alleged a durable medical equipment kickback scheme, which was closed due to insufficient information.  In 2015, Medicare closed a patient allegation of false billing by HHA Alpha after a review of documents provided by HHA Alpha justified the billing.

[5] Only three patients out of 129 interviewed by FBI complained and the complaints consisted of (1) early discontinuation of treatment, (2) a nurse should have shown up more often, and (3) physical therapy should have been longer.  Of all patients referred to HHA Alpha by targets of the investigation during the UCO, the FBI was unable to interview 31 patients due to the patients passing away in hospice care or because the patients could not be located – generally international patients.  As to those patients, no complaints regarding patient care were ever filed against HHA Alpha.

4

through the duration of the UCO. During the course of the UCO, a total of 27 subjects were paid kickbacks and referred patients to HHA Alpha. At no time during their meetings with CW-1 and/or UCE did the subjects express any concerns regarding the treatment of their patients by HHA Alpha nor notify that any patient complaints had been received. Further, none of the subjects indicated they were aware of any illicit conduct by HHA Alpha prior to or during the UCO.

### C. AGENT QUALIFICATIONS

11.     I am a Special Agent of the FBI and have been so employed for approximately three years. I am currently assigned to the Complex Financial Crime Squad of FBI's San Francisco Field Division. As part of my assigned duties, I investigate possible violations of federal criminal law, specifically investigations involving white collar crime. I have received specialized training in health care fraud matters including, but not limited to, Anti-Kickback, Mail Fraud, Wire Fraud, and False Claims. I have participated in the execution of various arrests and search warrants in which business and personal documents, bank records, computers, and other evidence of fraud and other crimes have been seized.

12.     In the course of this investigation and my investigation of other health care fraud schemes, I have (1) interviewed numerous persons; (2) reviewed numerous records and pertinent data; (3) read interviews and other reports written by other law enforcement officers; and (4) become familiar with the manner and means by which health care fraud schemes are operated including violations of 42 U.S.C. Section 1320a-7b.

13.     This affidavit is intended to show merely that there is sufficient probable cause for the requested Complaint and arrest warrant and does not set forth all of my knowledge about this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.  Where excerpts of transcripts of audio recorded conversations are presented, they represent my best effort at this time to transcribe such recordings and I believe them to be accurate in substance.

### D.  COMPLAINANT

14.     GLENNDA SANTOS, is a 46 year old citizen of the Philippines residing in San Ramon, California. Immigration records indicate SANTOS, also known as GLENNDA MENDOZA

MAYUGA, date of birth January 9, 1972, illegally resides in the United States and may be subject to immigration removal proceedings.

### E. STATUTES VIOLATED

15.     **Title 42, United States Code, Section 1320a-7b(b)(2)(A)**, in relevant part, makes it a crime for any person to knowingly and willfully offer or pay any remuneration (including any kickback, bribe, or rebate) directory or indirectly, overtly or covertly, in cash or in kind to any person to induce such person to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program.

## II. PROBABLE CAUSE

### A. SANTOS ARRANGES THE KICKBACK SCHEME

16.     During a consensually recorded meeting on March 23, 2017, CW-1 met with SANTOS and proposed a business partnership. CW-1 explained s/he and a business partner (UCE) would be purchasing CW-1's home health company (an actual HHA hereinafter referred to as "HHA Alpha"). CW-1 further explained s/he and the business partner were looking to increase HHA Alpha's patient population ("census") prior to the purchase. As part of their agreement, SANTOS would introduce CW-1 and the business partner to individuals willing to accept kickbacks for patient referrals to HHA Alpha. During her conversation with CW-1, SANTOS indicated she knew who participated in similar kickback schemes and offered to pay these individuals on behalf of CW-1. SANTOS further indicated these individuals would benefit from a relationship with HHA Alpha as it would increase the number of companies to which they refer patients. As such, the individuals avoid the appearance of having exclusive relationships with select HHA companies, which draws scrutiny from Centers for Medicare and Medicaid Services ("CMS") and other oversight agencies. Below is an excerpt of the aforementioned exchange:

> SANTOS:     So so what is the thing next? You will buy the company with a guy so you want me to help you on the end that I can bring patients...
>
> ...

| | |
|---|---|
| SANTOS: | I know already who has access to who are paying. |
| CW-1: | Right. |
| SANTOS: | I just have to go into there, and then I will offer and then double it because one person cannot just work with one you know what I mean? |

17.     On April 3, 2017, CW-1 introduced SANTOS to UCE. During their meeting, which was recorded by both CW-1 and UCE, CW-1 and UCE re-iterated their involvement in the purchase of HHA Alpha and their desire to increase the company's patient census. SANTOS explained she would need to coordinate introductions to those willing to engage in the kickback scheme based on the amount of patients CW-1 and UCE wanted to bring to HHA Alpha each month. Below is an excerpt of the aforementioned exchange:

| | |
|---|---|
| SANTOS: | We actually talk about it, because I said like how much patient do you want me to increase it? Because I have to plan it myself. |
| CW-1: | Right. |
| SANTOS: | Like how many people can I introduce? Who are the people that I need to bring in? So what is the number to increase every month you know? |

18.     During the meeting, UCE expressed his/her concern as to who would be introduced into the kickback scheme. SANTOS reassured she would only solicit individuals she trusted. SANTOS was aware these introductions would lead to an illicit partnership with UCE and it was important to only involve those individuals SANTOS believed would not report their illegal activity. Further, SANTOS reassured she would only solicit individuals she knew already engaged in a similar kickback schemes. Below is an excerpt of the aforementioned exchange:

| | |
|---|---|
| UCE: | Don't take a chance on someone, unless you're sure. |
| SANTOS: | Oh of course. |
| CW-1: | Right. |
| SANTOS: | Course. I will…of course. I know how to do it. |
| … | |
| SANTOS: | But if it should be someone that is really a done deal and very very close to me. |

7

...

| | |
|---|---|
| UCE: | I would rather miss out on a [unintelligible]. |
| SANTOS: | Yeah, yeah, yeah, I know I know. |
| UCE: | ...then have anything blow up in our faces. |
| SANTOS: | I know who to give... |

19.     During the same meeting, SANTOS gave examples of how she previously structured kickback payments and how many patients she received in return. Below is an excerpt of the aforementioned exchange:

| | |
|---|---|
| SANTOS: | I have a manager. I have a case manager...I um John Muir. |
| | ... |
| SANTOS: | I giving her 3,000 a month then she gives like 10 or 15 [patient referrals] because based on cases. Like I tell her... |
| | ... |
| SANTOS: | There are some that are like 400...they're done. There are doctors that prepay... |
| CW-1: | That's per patient? |
| SANTOS: | ...yeah but there are doctors some of them are per month. |
| | ... |
| SANTOS: | This is how I started with the new one. Hey, I give you 1,000 and you give me three. |
| ... | |
| SANTOS: | You pay different stuff. |

20.     On April 11, 2017, SANTOS placed a call to CW-1, which was recorded by CW-1, to discuss how she would introduce CW-1 to those willing to accept kickbacks, but refused to discuss the amount of the kickback payments over the phone. SANTOS's reluctance to discuss kickback payments amounts over the phone, further demonstrated her attempts to conceal evidence of the illicit conduct. Below is an excerpt of the aforementioned exchange:

| | |
|---|---|
| SANTOS: | ...tonight when I get home, I will have a list, like how we are going to plan everything on Friday. |
| CW-1: | Perfect. |
| SANTOS: | And then I will send it to you. |

8

| CW-1: | So perfect. That's exactly what I wanted you to do, if you could text me the list of the accounts we are going to and how much cash we should bring for each account. |
|---|---|
| SANTOS: | I will not actually, I will not actually tell it on the phone, so I will have to tell it to you in person. |
| CW-1: | Yeah that's fine. That's fine. |
| SANTOS: | Yeah yeah yeah. |
| CW-1: | Either way. |
| SANTOS: | So I will send you the list and then we can talk in the person for the amount. |

21.    On April 13, 2017, SANTOS placed another call to CW-1, recorded by CW-1, during which SANTOS reassured CW-1 she would brief the co-conspirator about the kickback scheme ahead of their meeting. In doing so, CW-1 and UCE could speak more openly about the kickback scheme during the meeting. Below is an excerpt of the aforementioned exchange:

| SANTOS: | Yes of course, that's why I said like, before I sent the list, I wanna make sure that like I tell you first what needs to be done because you might feel like, hey I know these people already, but you are not actually maximizing what you can get, because it was not endorsed properly. |
|---|---|
| CW-1: | Right. |
| SANTOS: | Because you guys we're not on the same language. |
| CW-1: | So when we go there then, they will know that Glennda already, like you already talked to them. |
| SANTOS: | [ui] I need to do is, like by the time I give you the list, like from tonight to tomorrow morning, I have them briefed, like they know what needs to be done, I I already talked. |
| CW-1: | Ok. |
| SANTOS: | I already…Like you were, like you were sold out already. |
| CW-1: | Ok perfect. |
| SANTOS: | You just need to give it. |
| … | |
| SANTOS: | Just a matter of like, they know that you're the face, I don't need to be there, but then I was like the one in between. |

**B.  SANTOS INTRODUCES CW-1 AND UCE TO CO-CONSPIRATORS**

22.     On or about April 14, 2017, SANTOS sent CW-1 a text message identifying three doctors, including "Dr Watson" and "Dr Massen", as individuals willing to meet CW-1 and UCE. In accordance with their earlier discussions, CW-1 understood s/he was to contact and discuss the kickback scheme with these individuals.  Set forth below is a screenshot of the aforementioned text message exchange:

‹        (G)        ⓘ
        **Glenda**

**Good morning**

**Dr Watson after 11 am
Dr Massen anytime of
the day**

23.     On the same date and prior to meeting WATSON and MASSEN, CW-1 recorded a conversation with SANTOS, during which SANTOS re-affirmed she had spoken to both WATSON and MASSEN. Below is an excerpt of the aforementioned exchange:

| | |
|---|---|
| CW-1: | Did you talk to Watson and Massen already? That we will be coming today or no? |
| SANTOS: | Yeah yeah you just have to tell me what time and when you are coming, then I can text them you are there, you're in the lobby. |
| … | |
| SANTOS: | I endorsed you already |
| CW-1: | Ok perfect |

24.     During the same conversation, SANTOS advised CW-1 on how to negotiate WATSON's kickback payment for patient referrals.

| | |
|---|---|
| SANTOS: | This is what…with Watson, he will actually like ask you like what exactly like [UCE} wants to uhhh, [UCE] wants to give him. |
| CW-1: | Oh he will, he will, he will tell me? |

SANTOS:    He will, ok let's say like you tell him like "Hey Dr. Watson, we are willing to give you three thousand this month, like how many patients can we get out of that?"

CW-1:      Ok. And he'll be ok? To talk to us?

SANTOS:    It is ok.

CW-1:      Ok perfect.

SANTOS:    I'm telling you, I'm giving you the ones that are hardcore.

CW-1:      Ok ok.

SANTOS:    Like someone who does it already.

25.   SANTOS then advised CW-1 on how many patients should be expected in exchange for the kickback payment. Below is an excerpt of the aforementioned exchange:

CW-1:      If I do, should I ask for like hey…you know I'm gonna give you like three thousand dollars, should I give him a number, I should be expecting this much, or he knows?

SANTOS:    Yes, yes.

CW-1:      So, so what's the, what's the good number so I don't like insult him or anything?

SANTOS:    Well you you you ask him like, if I give you three thousand how much patients can you have? Can you give like eight [patients]?

CW-1:      Ok, ok perfect

26.   Prior to meeting the physicians CW-1 and UCE contacted MASSEN and WATSON separately and met with both doctors individually. During the meetings, the doctors indicated they had previously spoken with SANTOS. UCE explained the dynamic of their recent partnership with SANTOS, relying on her to establish "trusted relationships" with those willing to engage in a kickback for patient referral scheme in order to increase the patient census at HHA Alpha. Details of the meetings are outlined below.

### 1.  DR. HENRY WATSON ("WATSON")

27.   On April 14, 2017, CW-1 and UCE met with WATSON at his medical office located in Oakland, California. WATSON confirmed he had previously spoken to SANTOS about their

11

meeting. WATSON indicated he and SANTOS had an established partnership, comparing their

arrangement to Joe Montana and Jerry Rice. WATSON also indicated he took direction from SANTOS,

stating "Montana probably says run and I'm a throw it". UCE understood this to be a reference to

WATSON trusting SANTOS to make introductions to those engaged in kickback schemes. Below is an

excerpt of the aforementioned exchange:

| | |
|---|---|
| UCE: | Ah so just so just wanted to ah I don't know how much ah Glennda was able to explain. |
| WATSON: | Well she was um just kinda Glennda and I are cut far alike ah Joe Montana and Jerry Rice. |

(all three laugh)

| | |
|---|---|
| WATSON: | I mean he probably… |
| CW-1: | Yeah. |
| WATSON: | …Montana probably says run and I'm a throw it.  You know. |

28.     WATSON further described his conversation with SANTOS, stating, "she was

[…] telling me that, you know, there's maybe a little bit new um gas in the tank." UCE understood

WATSON's use of the phrase "gas in the tank" to be a reference to anticipated kickback money.  Shortly

thereafter, UCE handed WATSON an envelope containing $3,000 cash, which UCE encouraged

WATSON to open and count.  WATSON declined and stated, "Oh no no I I I believe."  UCE understood

WATSON's statement to be a show of trust regarding the amount of cash inside the envelope.

29.     During the course of the UCO, WATSON met with UCE on at least three more

occasions, during which WATSON accepted cash in exchange for referring patients to HHA Alpha and/or

introducing UCE to other physicians willing to engage in the kickback scheme. All of WATSON's

meetings with UCE were recorded by UCE. In total, WATSON accepted over $10,000 in cash from UCE

and referred over eight patients to HHA Alpha, including three Medicare beneficiaries.

### 2.  DR. ARKADY MASSEN ("MASSEN")

30.     On April 14, 2017, CW-1 and UCE recorded a meeting with MASSEN in the

parking lot of a Skilled Nursing Facility in Hayward, California. The meeting was recorded by both CW-1

and UCE. During the meeting, CW-1 and UCE referenced their arrangement with SANTOS and gauged if

MASSEN had spoken with SANTOS prior to the meeting. Below is an excerpt of the aforementioned exchange:

| | |
|---|---|
| UCE: | So, our our attitude is we we are willing to make ourselves competitive and we're willing to do what that takes.  Um and we know ah so I I and I don't know if ah Glennda had a chance to explain to you why she couldn't be here, but basically… |
| MASSEN: | Oh I don't need an explanation.  (laughs) |
| UCE: | No, no (laughs) |
| MASSEN: | Don't stick up for Glennda. |
| UCE: | No no we just want to make sure you under…she's fully on board with us, but because of the work that like what we're gonna do with you today.  She does for Amity and she can't be seen with us doing it.  So, she's fully on board and everything like that.  She just doesn't want, cause if… |
| MASSEN: | Oh, I understand. |
| UCE: | …we start increasing our numbers and she's seen with us, it works that way, but you have the same trusted relationship with her.  We want the same trusted relationship with you. |
| MASSEN: | Sounds good. |

31.     During the meeting, CW-1 and UCE explained their plan to grow HHA Alpha's patient census. UCE asked MASSEN whether an "envelope with $3,000" was a "good way for us to start our relationship." MASSEN responded it was a "Good beginning" and accepted the envelope.

32.     During the course of the UCO, MASSEN met with UCE on at least ten more occasions, during which MASSEN accepted cash in exchange for referring patients to HHA Alpha and/or introducing UCE to other physicians willing to engage in the kickback scheme. In total, MASSEN accepted over $18,000 in cash from UCE and referred over ten patients to HHA Alpha, including two Medicare beneficiaries.

33.     Following the meetings with WATSON and MASSEN, UCE placed a recorded call to SANTOS (same date as the meetings) to update her on what occurred. During the call, UCE praised SANTOS for her influence over WATSON and MASSEN, indicating UCE's discussion with both

doctors regarding the kickback scheme was more "comfortable" as a result of her "backing". Below is an

excerpt of the aforementioned exchange:

| | |
|---|---|
| UCE: | Everybody you know every we all understand that and ah I think it works out just fine because clearly these two guys ah were very very comfortable just knowing just knowing you were around even if you weren't in the room.  So… |
| SANTOS: | Yeah. |
| UCE: | …totally totally different experience with your with your backing. |
| SANTOS: | Yeah yeah it's like oh my God they are very both of them are very business minded. |

29.     During the same call, UCE reassured SANTOS that her assistance in growing

HHA Alpha's census would remain discreet. Below is an excerpt of the aforementioned exchange:

| | |
|---|---|
| UCE: | We we made that very clear ah especially to ah Dr. Watson.  Don't worry about the the special sort of relationship is is just us, but someone will be coming by and reminding you that [HHA Alpha] is is here and we're looking for our work and you just treat them normally. |
| SANTOS: | Ok and then and then with Dr. Massen.  Like what did you say? |
| UCE: | He was great.  Ah he was great.  He was happy with the um he's he was happy with the numbers that we came up with… |
| SANTOS: | That's good. |

30.     SANTOS offered to introduce UCE to other co-conspirators and further

requested her endorsement remain discreet due to her concern of Amity and others finding out. UCE once

again confirmed with SANTOS that she would only introduce UCE to those with whom she had a

"special trusting relationship". Below is an excerpt of the aforementioned exchange:

| | |
|---|---|
| SANTOS: | Cause I don't wanna kinda blow up.  You have to be careful of how you will approach it. |
| UCE: | Absolutely. |
| SANTOS: | And I think one of one of the information I will do is I will let you guys know who are the keeper in each place is and you guys just have to targeted it on your own and I'll tell you how, but I can't some of them I cannot not endorse because for sure they will tell someone about it and then it will spread.  You know what I mean? |

14

| UCE: | Yeah, no I understand I understand that. We'll be ah you know we're ok with ah going in on our own if you think that they're the right people and the right key phrases will help them understand. We're ok with taking that chance. |
|---|---|
| SANTOS: | Yeah so we will we will try ah um a combination of strategies. |
| UCE: | No problem. As long as long you have a special trusting relationship with them. We're willing to work. |
| SANTOS: | Yes. Ok, good. Perfect. Ok then I'm excited to start on [unintelligible]. So once I start on a [unintelligible]. I'll be representing doctors and am meeting doctors and the new doctors I can easily give you guys without worrying who will see or who will not. You know what I mean? |

## C. SANTOS IS PAID FOR HER INTRODUCTIONS TO CO-CONSPIRATORS

31.     On or about July 13, 2017, CW-1 and UCE recorded a meeting with SANTOS and paid her $1,000 for the introduction to WATSON and MASSEN ($500 per introduction).

32.     During the same meeting, SANTOS was paid $500 cash for connecting CW-1 and UCE to a case manager at California Pacific Medical Center ("CPMC") in San Francisco, CA. SANTOS offered to make additional introductions to co-conspirators who could refer patients from CPMC. Below is an excerpt of the aforementioned exchange:

| UCE: | So one from CPMC and then Watson, Massen. So I got 1,500 here. Ok, sound good? |
|---|---|
| | … |
| SANTOS: | Yeah. |
| UCE: | So this is this is the five [hundred], for the case manage [case manager from CPMC]. and then this is this is ah thousand. |
| SANTOS: | Why don't we go to CPMC one time, so that I can introduce you? |

## D. SANTOS MAKES ADDITIONAL INTRODUCTIONS IN FURTHERANCE OF THE SCHEME

33.     During the course of the UCO, SANTOS introduced CW-1 and UCE to co-conspirators willing to accept kickbacks in exchange for patient referrals. In addition to WATSON and MASSEN, SANTOS introduced CW-1 and UCE to three doctors working in the San Jose, CA area. Similar to WATSON and MASSEN, all three doctors agreed to send patient referrals to HHA Alpha in

exchange for monthly cash payments. SANTOS also introduced CW-1 and UCE to two hospital case managers working at Washington Hospital in Hayward, CA. These case managers later referred patients to HHA Alpha in exchange for kickback payments. SANTOS received at least $5,000 in cash from UCE for facilitating the introductions.

### III. PROBABLE CAUSE FOR THE VIOLATION

#### A. TITLE 42 UNITED STATES CODE, SECTION 1320A-7B(B)(2)(A), THE ANTI-KICK BACK STATUTE

34.     Title 42 United States Code, Section 1320a-7b(b)(2)(A), in relevant part, makes it a crime to knowingly and willfully offer any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person to refer an individual to a person for the furnishing or arranging for the furnishing of any service for which payment may be made in whole or in part under a Federal health care program.

35.     Based on all of the foregoing, probable cause exists to believe SANTOS facilitated UCE's kickback payments to WATSON and MASSEN in order to induce WATSON and MASSEN to send patient referrals to HHA Alpha for home health and/or hospice services later billed to Medicare.

36.     Medicare is a federally funded health care program, and the referral of patients to HHA Alpha by WATSON and MASSEN for home health and/or hospice services constitutes a referral, as defined by Title 42 United States Code, Section 1320a-7b(b)(2)(A).

37.     Therefore, there is probable cause to believe that SANTOS' facilitation of UCE's kickback payments to WATSON and MASSEN to induce WATSON and MASSEN to send patient referrals to HHA Alpha, meets the definition of a kickback payment and violates anti-kickback statute.

### IV. CONCLUSION

38.     Based on the foregoing, there is probable cause to believe SANTOS facilitated the payment of kickbacks in exchange for patient referrals, in violation of 42 U.S.C. § 1320a-7b(b)(2)(A).

16

## V.  REQUEST FOR SEALING

39.     Since this investigation is ongoing, disclosure of the Complaint, this affidavit, and/or this application and the attachments thereto will jeopardize the progress of the investigation. Disclosure could result in the destruction of evidence, intimidation or collusion of witnesses, or the flight of a suspect.  Accordingly, I respectfully request the Court issue an order directing this Affidavit and any related documents be sealed until the further order of this Court.

Janette Spring, Special Agent
Federal Bureau of Investigation

Sworn to and subscribed before me

this ___3rd___ day of September, 2019.

HON. JOSEPH C. SPERO
United States Chief Magistrate Judge